UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TENICIA L. HODGE,

              Plaintiff,                 Case No. 04-73981

vs.

                                    JUDGE JOHN CORBETT O'MEARA

JO ANNE B. BARNHART,          MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

_____/

**OPINION AND ORDER**

**I.**    **BACKGROUND**

      Tenicia L. Hodge brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits under Title II, and Supplemental Social Security Income under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment, and have consented to the undersigned's jurisdiction pursuant to 28 U.S.C. § 636(c). For the following reasons, this matter is REMANDED FOR RECONSIDERATION.

      **A.**    **Procedural History**

      This is an action by the Plaintiff, Tenicia L. Hodge, seeking judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) and Supplemental Social Security Income (SSI). See 42 U.S.C. §§ 416(i), 423(d) and 42 U.S.C. § 1382c(a)(1)(3). Plaintiff applied for DIB and SSI on April 22, 2002, alleging that she had became disabled on April 11, 2002, (R. 50) due to an acute herniated disk (R. 56). Plaintiff's application was denied initially, and following a hearing before Administrative Law Judge Daniel G. Berk (ALJ Berk) (R.13-23). The Appeals

Council denied Plaintiff's request for review (R. 5-8).

**B.    Background Facts**

*1.    Plaintiff's Testimony*

In her disability application Plaintiff indicated that she had limited ability to sit, stand and walk and that she had to stop and rest when she cooked, had trouble getting out of the bath and could only socialize with her mother at her mother's house because she needed to lie down during visits (R. 71). Plaintiff could do her own grocery shopping, but noted that she needed the assistance of a family member, had to use the "sit down cart" and rest while shopping (R. 73). Plaintiff could complete household chores such as cooking, washing dishes, laundry and child care, but it took her 5-8 hours to do so. If she needed to stop she was not able to work again for 1-2 hours or until the next day (*Id.*). Plaintiff noted that she had trouble dressing, bathing, grooming, sleeping and accessing public transportation (R. 73-74). Her pain medication caused drowsiness. Her doctor limited her activities and told her to rest (*Id.*).

On June 14, 2004, Plaintiff appeared with counsel and testified before ALJ Berk. Plaintiff had three dependant children (ages 19, 11, and 7), and had no income other than government assistance (R. 182). Plaintiff was married at the time of the hearing and indicated that her husband *had* been assisting with the expenses. Plaintiff indicated that her marriage was ending (R. 198). Plaintiff finished the tenth grade and has had no education or training since that time (R. 183). She was last employed as a quality inspector at Product Action, where she worked from January 2002, until April 12, 2002 (R. 183). This job required lifting up to 50 pounds, standing, walking and

bending (*Id.*).  This employment ended because her back pain was too severe to continue (R. 188).[1]

Plaintiff had excruciating pain, a "pins and needles" sensation in her back all the time, and a feeling like electricity going down her back and into her right leg (R. 192).  She attended the pain clinic for treatment because her doctor advised her that back surgery was not an option for her, as the procedure would take too long, six hours (*Id.*).  She had seven in a series of nine monthly epidural pain injections, which have not alleviated her pain (R. 192-93).  When questioned why she would continued this treatment when it is not working, instead of requesting alternate treatment, Plaintiff answered that she had "been talking to people" but that they "keep giving me the epidural shots...keep sending me to the pain clinic.  It's all we can do for you" (R 193).  Plaintiff stated that she refused to consider medication as treatment because she was "tired of taking medication;" the pain medication did not alleviate the pain for more than a minute and not at all when she was moving around (R. 193-194).  Plaintiff also testified that she was taking Elavil and Vicodin, and admitted that she sometimes missed doses when she grew tired of taking the medication (R. 194).

On a typical weekday, Plaintiff took her children to school at 7:50 a.m., would return home and lie back down around 9:00 a.m. until she picked her children up from school at 2:30 p.m. (R. 194).  Plaintiff would again lie down upon returning from picking her children up and then get up to cook dinner, which she did with some difficulty due to pain (R. 195).  Plaintiff stated that she "catnap[ped] all day" and only slept for a minute at a time at night because of leg pain (R. 195).

Dr. Kovan prescribed a cane after Plaintiff refused to use the walker he prescribed when she

---

[1]Plaintiff first applied for Workers Compensation Benefits in March 2003, and received a redemption settlement award of $45,940 on March 9, 2004 (R. 189).

3

was discharged from the hospital (R. 196). While Plaintiff was diagnosed with carpal tunnel syndrome in her dominant right hand in 1999, she had not had any recent treatment for this condition (R. 196-97).

### 2. Medical Evidence

On April 14, 2002, Plaintiff was admitted to the emergency room with complaint of low back pain, tingling sensation down her right leg with numbness, and inability to walk (R. 86). Computerized tomography (CT) of Plaintiff's spine revealed a herniated disk in the lumbosacral spine (R. 91), with root impingement (R. 95).[2] Plaintiff was discharged on April 17, 2002 (R. 100). At that time Plaintiff's occupational therapist opined that she was having some issues with mobility, self care and balance while standing, but believed that her rehabilitation potential was good (R. 101). On April 18, 2002, Plaintiff received an epidural steroid injection (R. 114-120). Her pain level was noted to be 4 on a scale of 0-10 (R. 117).

On April 22, 2002, Eric A. Kovan, D.O., examined Plaintiff (R. 105). At that time she was taking prednisone three times a day and Tylenol #3 to control her pain (R. 105). Plaintiff reported continued severe back and radicular pain requiring her to use a wheelchair and/or walker for mobility (R. 105). Physical examination revealed pain and limitation in the entire right lower extremity with questionable weakness of 4+/5 in the dorsiflexor of the EHL on the right foot and an antalgic gait secondary to pain (*Id.*). Dr. Kovan recommended that Plaintiff undergo an MRI and EMG, receive an epidural steroid injection and have a surgical consult with Dr. Peter Bono (*Id.*).

On April 29, 2002, Dr. Kovan reexamined Plaintiff (R. 103-04). Plaintiff reported slow

---

[2] A chest X-ray taken on this same day revealed a hilar prominence which was visible on the lateral film but could not be substantiated on the frontal film (R. 102).

4

improvement following the steroid injection, but noted severe back and radicular pain down her right leg, especially when she did too many activities at home (R. 103).  Upon examination, Plaintiff had decreased pain in her lower extremity compared to last visit, some weakness, and questionable pain limitation (*Id.*).  Plaintiff's straight leg raise and Bragard's maneuver were negative (*Id.*).  Plaintiff's gait was antalgic with a limp to the right and she was able to heel-toe walk with pain (R. 103).  She had limitations in forward flexion with spasms in the low back (*Id.*).  Plaintiff was diagnosed with right L5 radiculopathy secondary to a herniated nucleus pulposus (*Id.*).  Dr. Kovan recommended another epidural injection the following day, continuation of pain medications, physical therapy and a return visit in one week (*Id.*).  Dr. Kovan indicated that Plaintiff wished to attempt all conservative management opportunities before surgery and he noted that, because there were no neurological deficits, surgery could be postponed (R. 104).  Dr. Kovan noted that Plaintiff's EMG revealed L5 radiculopathy with abnormal fibrillations and positive waves in the L5 mytome (*Id.*, *see also* R. 106).  On April 30, 2002, Plaintiff received another epidural steroid injection with a pain level of 5 (R. 108 and 110).

On June 11, 2002, Plaintiff was evaluated for physical therapy (R. 136-38).  Plaintiff's initial evaluation reveals that she rated her pain at a 6/10 (R. 136).  Plaintiff reported that her symptoms were originally on her right side and that the epidural injections had alleviated that pain and now the pain was on the left side (*Id.*).  She also indicated that the pain was worse bending, sitting, rising from sitting, standing, walking at the end of the day or up stairs, or when she was still (*Id.*).  Her symptoms were better in the morning, when she was on the move and when she was lying down (*Id.*).  Plaintiff reported that she sometimes lost her balance and needed to use her cane (*Id.*).  The physical therapist determined that Plaintiff symptoms were consistent with lumbar derangement (R.

5

137).

By June 21, 2002, the physical therapist reported that Plaintiff was doing very well in physical therapy, had no leg symptoms and only low back soreness with lumbar flexion and prolonged sitting, which were controlled with home exercises (R. 139). Plaintiff was beginning to work on strength building exercises and the therapist reported that Plaintiff could now complete all prescribed exercises without pain (*Id.*). On June 28, 2002, however, Plaintiff started to report a return of symptoms to her physical therapist and physical therapy was put on hold (R. 141).

On July 4, 2002, Plaintiff was examined in the Botsford General Hospital Urgent Care by Daniel Richardson, D.O., for complaints of pain in her right buttocks radiating down her right leg (R. 123). Plaintiff reported that she had been admitted to the hospital for the pain previously and that it had improved and resolved and had now returned (*Id.*). Upon examination, Plaintiff was neurologically intact and her reflexes in her right foot were equal (R. 123). Plaintiff had subjective paresthesia over the L4-L5 dermatomes. Dr. Richardson noted that although Plaintiff complained of pain with attempts to move her leg he was able to raise her leg to 80 degrees without increasing her discomfort (*Id.*). Plaintiff was observed moving about on the cart and moving on and off the bedpan without assistance (R. 124). Dr. Richardson consulted with Dr. Kovan over the telephone and they agreed to treat Plaintiff on an out-patient basis, to which Plaintiff agreed (*Id.*). Plaintiff was diagnosed with an acute exacerbation of sciatica of the lower right extremity, and was discharged with directions to rest, ice her back and continue taking Valium, Vicodin and Predinisone (*Id.*).

On July 9, 2002, Plaintiff returned to physical therapy with a new prescription for reevaluation following her visit to the emergency room (R. 141). On July 10, 2002, Plaintiff returned to physical therapy, but was unable to complete the exercises and therapy was put on hold

6

pending the doctor's recommendation (*Id.*). On July 16, 2002, Plaintiff reported at physical therapy that she was not having any leg pain but that her foot numbness persisted (*Id.*). Yet, symptoms returned when she attempted her exercises (*Id.*). Physical therapy was also stopped on July 17, 2002, when Plaintiff reported that movement increased leg pain (*Id.*). Plaintiff then failed to attend her physical therapy appointments or call on July 18, 23, 24 and 26 (*Id.*) and her course of therapy was, therefore, cancelled (R. 143).

On July 20, 2002, Plaintiff was seen by Jennifer Joseph, D.O., in the emergency room with another exacerbation of sciatica (R. 131-32). Upon examination, Plaintiff's strength was limited due to pain, but her deep tendon reflexes were equal (R. 131). Plaintiff's pain was described as intractable. She was admitted to the hospital by Dr. Aschenbrener, after a consultation with Dr. Bono, who was apparently called by the emergency room doctor after a milligram of Dilaudid was unable to alleviate her pain (R. 132). Plaintiff was treated with Valium, Decadron, Zantac, Toradol, Vicodin and morphine in the emergency room (*Id.*).

On July 24, 2002, Plaintiff was again seen in the emergency room for an exacerbation of right sciatic back pain (R. 134-135). Plaintiff reported pain radiating down her right leg. She was not taking her Flexeril regularly because it made her too drowsy and that she only took Vicodin when she was to the point of tears (R. 134). Plaintiff also reported that there had been some discussion of surgery (*Id.*). She was given a course of Dilaudid and discharged when the pain showed some improvement, with instructions to follow up with her doctor (R. 135).

On October 7, 2002, a state agency physician reviewed the medical evidence of record and completed a Physical Residual Functional Capacity Assessment in which the physician opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and sit six hours in an

eight hour work day, perform unlimited push and pull functions and work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling despite her back impairment (R. 78-84). The state agency physician noted that Plaintiff had a history of acute lower back pain that radiated to her right leg, that her CT scan showed a disc rupture at L5-S1, that she had started epidural steroid injections and physical therapy, and that she had been admitted to the emergency room twice for pain (R. 78-79).

On December 2, 2002, Plaintiff was discharged from the hospital with no restrictions on activity/transfers, working/lifting, driving or personal care (R. 144). The record is not clear as to why Plaintiff visited the hospital on this occasion.

On December 6, 2002, Plaintiff was discharged from the hospital with a medication change and instructions to follow up with Dr. Kovan (R. 146). Again, the record is not clear as to why Plaintiff visited the hospital on this occasion.

On December 17, 2002, Peter L. Bono, D.O., examined Plaintiff for a surgical consult (R. 148). Dr. Bono noted that Plaintiff had dorsiflexion and plantar flexion of the foot which she did not have in the hospital and which was an improvement, and that her MRI showed degenerative disc disease at L4-L5 and L5-S1 with a small disk herniation at L4-5 and effacement of the L5 nerve root (R. 148). Dr. Bono indicated that he did not think Plaintiff was a surgical candidate at that point, and stated that she would require a fairly large surgery to stabilize her symptoms and he was not prepared to perform such a procedure on her (R. 148).

A July 3, 2003, MRI showed degenerative disc disease at L4-L5 with minimal annular disk bulge without causing canal stenosis or neural foraminal, and, at L5-S1, a disc protrusion superimposed upon an the annular bulge which was effacing the intradural segment of the right S1

8

nerve root (R.150).

On July 21, 2003, Plaintiff, who arrived in tears of pain, received another epidural steroid injection (R 159).

On August 4, 2003, Plaintiff visited the pain clinic and reported pain of 6/10 with medication normally 9/10 but, at worst, 10/10 without medication (R. 158).

On September 3, 2003, Plaintiff visited the pain clinic and reported pain ranging from 4/10 to 10/10 (R. 156). She stated that she was unable to attend physical therapy due to chondritis and requested a new physical therapy prescription (*Id.*). A consultation with neurosurgeon Dr. Daniel Michaels was recommended (*Id.*).

Plaintiff was hospitalized on September 9, 2003, for treatment of kidney stones (R. 152). Plaintiff complained of urinary incontinence lasting two weeks and was awaiting the results of further testing (R. 152).

On October 3, 2003, Plaintiff had a recheck visit at the pain clinic (R. 153). Plaintiff indicated that she could not consult with neurosurgeon Dr. Michaels because he was not in her insurance network (*Id.*). She reported that her pain was, at best, 6/10, and, at worst, 8/10 (*Id.*). She was frequently woken up by pain and could not lie on her side or back to sleep (*Id.*). She indicated that was taking her pain medication as prescribed, but that there was no change in her level of pain or ability to manage pain related problems (R. 154).

Plaintiff participated in physical therapy between March 20, 2004, and April 14, 2004, to treat ongoing mechanical back pain, degenerative disc disease and radicular pain (R. 160-164). Plaintiff rated her pain as a 7/10, and reported increased pain with therapy (R. 160). Plaintiff complained of pain with standing, walking, sitting and bending forward (*Id.*).

9

An April 25, 2004, MRI of the lumbar spine revealed disc degeneration at the L4-5 and L5-S1 levels and small disc herniation to the right L5-S1 (R. 165).

### 3.    *Vocational Evidence*

The Vocational Expert, Elisa Pasikowski (VE Pasikowski), testified at Plaintiff's administrative hearing.  VE Pasikowski was asked to consider a hypothetical person of Plaintiff's age, education, and work experience who could perform work at the light exertional level with a sit/stand option (R. 201).  VE Pasikowski testified that the following jobs existed in the greater Detroit metropolitan region that such a person could perform:  clerk (5,600 jobs), assembly positions (4,800 jobs and cashier (3,600 jobs) (R. 201).  If the hypothetical person were limited to sedentary work with a sit/stand option, that person could perform work as an inspector (2,100 jobs), packer (2,300 jobs), information clerk (1,500 jobs) or identification clerk (1,200 jobs) (R. 202).  VE Pasikowski testified that the existing jobs would be doubled if the region were expanded to include the entire state of Michigan, and that the hypothetical person would be precluded from all employment if required to lie down five-six hours per day (*Id.*).

### 4.    *The ALJ's Decision*

ALJ Berk determined that Plaintiff was 34 years old, had a tenth grade education and formerly worked as a quality inspector, auditor, machine operator and checker (R. 19).  Plaintiff was considered a younger individual (R. 22).  Plaintiff had not engaged in substantial gainful employment since 2002 and met the special status requirements of the Act on April 11, 2002, through the date of his decision (*Id.*).

Plaintiff was diagnosed with small disc herniation at L4-L5 with some evidence of S1 nerve root involvement, and complained of chronic low back pain and right radicular pain in connection

10

with such (R. 22). Plaintiff's impairment and resulting pain did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4 (*Id.*).

ALJ Berk found that Plaintiff's allegations were not wholly credible because they were not supported by the objective medical evidence and were not consistent with Plaintiff's reported daily activities (*Id.*).

Plaintiff was unable to perform her past work as a quality inspector or machine operator and had a residual functional capacity (RFC) to perform the requirements of light and/or sedentary work with a sit/stand option (*Id.*). Plaintiff did not have any transferable work skills for skilled or semi-skilled work (*Id.*). Using the Medical-Vocational Guidelines as a framework for decision making and considering the VE's testimony regarding the number of jobs available, ALJ Berk found that there were a significant number of jobs in the national economy that Plaintiff could perform and she was, therefore, not disabled (R. 22-23).


II.   **ANALYSIS**

   A.   **Standards of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because

substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[3]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.     Factual Analysis

Plaintiff argues that the Commissioner (a) erred in finding that her subjective complaints of pain were not supported by medical evidence, (b) placed too much weight on the state agency physician's assessment and (c) incorrectly interpreted Plaintiff's self-reported ability to complete household tasks.

The standard for an administrative law judge's credibility finding is as follows:

> the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.  The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have

---

[3] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.   The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.   This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

S.S.R. 96-7p.

Further, given that the ALJ was privy to Plaintiff's in-person testimony, the undersigned is limited to evaluating whether or not the ALJ's explanations for discrediting Plaintiff were reasonable and supported by substantial evidence in the record.  *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

ALJ Berk determined that Plaintiff's allegations were not "wholly credible because they were not supported by the objective medical evidence and are not consistent with the claimant's reported activities of daily living" (R. 22).  No further explanation is given as to the reasoning behind this conclusion regarding daily activities.

### 1.      *Plaintiff's Daily Activities*

Regarding her activities of daily living, ALJ Berk stated that Plaintiff "reported her activities of daily living included cooking, washing dishes, doing the laundry, and taking care of her children. She also reported that she does the grocery shopping and occasionally shops for clothing." (R. 20). In support of this conclusion ALJ Berk refers the reader to Exhibit 4E, Plaintiff's disability application.  Yet, as previously stated in Section I(B)(1) Plaintiff's Testimony, while Plaintiff does indicate that she is responsible for completing these tasks, she also indicated that she does so only

with pain, with assistance and often over a lengthy period of time with long breaks (R. 72-74), such as lying down for several morning and early afternoon hours between taking her children to school and picking them up (R. 194), which was not discussed in the ALJ's decision. A claimant "need not be bedridden or completely helpless in order to fall within the definition of 'disability.'" *Walston v. Gardner*, 381 F.2d 580, 585 (1967). In her application Plaintiff stated that she could not walk for longer than 2-3 minutes, climb more than 2-3 stairs, lift more than 3-5 pounds, sit without discomfort, cook without stopping to rest or shop without assistance and use of a "sit down cart" (R. 70-73). Her daily activities as actually and accurately described in the record do not support the ALJ's credibility determination.

### 2.    *Plaintiff's Pain Related Complaints*

Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in determining RFC. Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))." *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986). While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, *(Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain. *See*

14

*Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v.*

*Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir. 1986).  While the underlying

condition must have an objective basis, neither the Social Security Act nor the regulations require

a claimant to prove the degree of pain and limitations by objective medical evidence.  Thus, an

adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective

medical evidence to fully corroborate the alleged severity of pain.  Section 404.1529(c)(2),[4] *see also*

*Duncan,* 801 F.2d at 853. *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,*

947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985);

*Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

     *Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994), made it clear that  "[t]here is no practical

difference between requiring a claimant to prove pain through objective evidence and rejecting her

subjective evidence because it is not corroborated by objective evidence."  Nor can an ALJ  merely

recount the medical evidence and claimant's daily activities and then without analysis summarily

conclude:

> Based upon an overall evaluation of the relevant written evidence of
> record as summarized above, the undersigned finds it does not contain
> the requisite clinical, diagnostic or laboratory findings to substantiate
> or form the underlying basis for claimant's testimony regarding totally
> disabling pain and other disabling impairments. . . .

---

[4]  29 C.F.R. § 404.1529(c)(2) states:
> We will not reject your statements about the intensity and
> persistence of your pain or other symptoms or about the effect
> your symptoms have on your ability to work solely because the
> available objective medical evidence does not substantiate your
> statements.

*Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994).

*Jones v. Commissioner,* 336 F.3d 469, 476 (6thCir. 2003), notes that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. SSR 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific. The ALJ must say more than that the testimony on pain is not credible. *Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id.* at 1039. "The SSA regulations clearly state that this is not the end of the analysis. 20 C.F.R. § 404.1529(c)(2)." *Id.* The ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain. *Id.* at 1039-1040.

Plaintiff indicated in her disability application that her daily activities were limited and regularly interrupted because of her pain and that she needed to stop frequently in order to rest (R. 71-74). She testified that her pain was constantly at a high level even with pain medication (R. 192-194), and this is the same information she consistently reported to her physicians and physical therapists (R.153-158,160,163). She also reported that physical therapy did not help and often increased her pain (R. 141, 142, 161, 162). She alleged that she had to lie down for most of the day

16

in order to alleviate her pain (R. 199), and reported to her physical therapist that her pain was constant but felt best when lying down or when she was "on the move" (R. 136-138). Pain interfering with consistent sleep at night and side-effects of her pain medication caused her to be drowsy during the day (R. 74 & 195). These factors should have been considered in more than a summary reference to "daily activities" in the context of determining whether Plaintiff's subjective pain complaints were credible.         Plaintiff had the burden of providing objective evidence confirming the severity of the alleged pain, or establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain. *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."*See also McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); *see also* 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their claims).

Here, Plaintiff has substantial objective and clinical diagnostic evidence of an underlying degenerative back problems at L4-L5 and L5-S1 confirming her diagnosis of a severe "underlying medical condition." As in most cases, there is no objective evidence of the pain itself. Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." Her subjective evidence and extensive and relatively consistent treatment history is central to this analysis. Yet, the evidence is not unequivocal. There are some inconsistent medical entries such as the December 2, 2002,

17

discharge order which sets no limitations on Plaintiff's activities (R. 144).  Also, the state agency physician's October 2002  Residual Functional Capacity Assessment form concludes that Plaintiff can perform a range of  light work (R. 78-79).

Plaintiff argues that the state agency physician's report in this matter should be discounted because it was two years old, based on a partial record and given by a non-examining doctor (Dkt. 6, pp. 8-9).  Counsel notes that SSR- 96-6p directs that an ALJ *must* consider and address the decision of state agency consultants in their opinions as medical opinions from non-examining sources, and should obtain an updated medical opinion from a medical expert to supplement a state agency medical consultant *when the ALJ believes* that a finding of medical equivalence is required (SSR 96-6p, p. 3-4).  It also requires an updated medical opinion "[w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Coucil may change the State agency medical . . . . consultant's finding that the impairments is not equivalent in severity to any impairment in the Listing of Impairments."  Here, the October 2002 report refers to an April 13, 2002, CT scan revealing a disc rupture at L5-S1 (R. 78).  Yet, Dr. Bono in December 2002 referred to an MRI showing degenerative disc disease at L4-L5 and L5-S1 with a small disk herniation at L4-5 and effacement of the L5 nerve root (R. 148).  It is not clear whether the state evaluator was aware of this MRI .  A July 3, 2003, MRI showed degenerative disc disease at L4-L5 and L5-S1 with a small disc herniation at L4-5 with the L5-S1 disc protrusion superimposed on an annular bulge and involving the right S1 nerve root (R. 159).  While ALJ Berk notes the small disc herniation at L4-5 and some evidence of S1 nerve involvement, he finds no meeting of equivalence under the Listing of Impairments (finding 3, R. 22).  Again, the state agency evaluator did not have this July 2003 MRI available noting involvement of the S1 nerve root, nor the December 2002 report noting L5 nerve

root involvement.

In addition, an April 25, 2004, MRI of Plaintiff's lumbar spine revealed disc degeneration at the L4-5 and L5-S1 levels and small disc herniation centrally and to the right at L5-S1 (R. 165). Again, the state evaluator did not have this MRI result nor the records showing that continued pain clinic epidural injections and physical therapy in 2003 and into 2004 were largely unsuccessful.

On this record, it seems the ALJ should have considered an updated evaluation from the state examiner on the issue of equivalence under SSR 96-6p. Even if that was not required under SSR 96-6p, the weight given to the state evaluator's dated opinion which was uninformed by more recent objective and clinical data undermines any significant reliance on it. Yet, this is the only expert opinion that Plaintiff could do light work as ALJ Berk found. Given its date and lack of complete medical data, it cannot serve as substantial evidence for a finding that Plaintiff can perform a limited range of light work at step 5 of the Commissioner's evaluation.

Thus, on the present record, with the inadequate credibility findings and dated and incomplete state evaluator opinion, there is not substantial evidence to uphold the Commissioner's finding. Thus the decision of the Commissioner cannot be upheld. The remaining question is whether to remand for further proceedings or for an award of benefits. *Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). On the present record, it cannot be said that Plaintiff meets these

requirements for an award of benefits. Thus, this matter will be remanded for further proceedings consistent with this Order including obtaining further medical evidence from a medical consultant if the Commissioner wishes to rely on any medical sources other than Plaintiff's treaters, and further equivalence evaluation under the Listing, and a further residual functional capacity evaluation including a credibility assessment consistent with SSR 96-7p and the case law of this Circuit.

## III.    ORDER

For the reasons stated above, this matter is REMANDED FOR RECONSIDERATION. The remand proceeding(s) shall take place before a different administrative law judge in order to ensure that Plaintiff is afforded a full and fair hearing and that a predetermination is not made on the facts as previously presented.

SO ORDERED.

Dated: September 28, 2005                              s/Steven D. Pepe
Ann Arbor, Michigan                                      United States Magistrate Judge

<u>Certificate of Service</u>

I hereby certify that copies of this Opinion and Order were served upon the attorneys of record by electronic means or U. S. Mail on September 28, 2005.

s/William J. Barkholz
Courtroom Deputy Clerk

20